# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF DEARBORN,

        Plaintiff-Appellee-Cross-Appellee-
        Cross-Appellant,

and

WEST VILLAGE SQUARE CONDOMINIUM
ASSOCIATION,

        Intervening Plaintiff,

v

BURTON-KATZMAN DEVELOPMENT
COMPANY, INC., BURTON-SHARE
MANAGEMENT COMPANY,

        Defendants-Cross-Appellants-
        Cross-Appellees,

and

WEST VILLAGE COMMONS, LLC,
WESTMINSTER HOMES, LLC f/k/a ABBEY
HOMES, LLC, CHARLES DIMAGGIO, DANIEL
SHARE,

        Defendants,

and

PETER BURTON, Individually and as Trustee of
the Peter K. Burton Revocable Living Trust, and
ROBERT M. KATZMAN, Individually and as
Trustee of Robert M. Katzman Revocable Living
Trust,

        Defendants-Appellants,

and

LAURENCE R. GOSS, Individually and as
Trustee of the Laurence R. Goss Revocable Living

UNPUBLISHED
December 18, 2014

Nos. 309758 & 313213
Wayne Circuit Court
LC No. 09-001342-CK

-1-

Trust, STEVEN BENTLEY, B/K/G INVESTORS, LLC, and BURTON-KATZMAN MANAGER, LLC,

Defendants-Cross-Appellees.

Before: MARKEY, P.J., and SAWYER and WILDER, JJ.

PER CURIAM.

Defendants-appellants, Peter Burton, individually and as trustee of the Peter K. Burton Revocable Living Trust, and Robert M. Katzman, individually and as trustee of Robert M. Katzman Revocable Living Trust, appeal by leave[1] an order requiring them to specifically perform duties of a Developer under a Development Agreement involving defendant, West Village Commons, LLC (West Village), and plaintiff-appellee-cross-appellee-cross-appellant, city of Dearborn (city). Defendants-cross-appellants-cross-appellees, Burton-Katzman Development Company (BKDC) and Burton-Share Management Company (BSMC), also challenge orders granting summary disposition to the city and finding them liable for the Developer's duties under the Development Agreement. BKDC, on cross-appeal, and BSMC, in a separate appeal by leave,[2] challenge orders requiring them to specifically perform. BKDC also argues the trial court should not have held it in contempt for failing to specifically perform and should have granted its motion for summary disposition of the city's silent fraud claim. The city challenges an order denying its motion for summary disposition against Burton and Katzman (and their trusts), along with defendants-cross-appellees, Laurence R. Goss, individually and as trustee of the Laurence R. Goss Revocable Living Trust, Steven Bentley, B/K/G Investors, LLC, and Burton-Katzman Manager, LLC. The city also challenges orders denying its motion to amend the complaint, striking allegations from the complaint, denying the request to refer the case back to case evaluation, and denying discovery requests. We affirm, in part, and reverse, in part.

I

This lawsuit arises from the construction of the West Village Commons Project ("Project"), which is a "mix-use" development in Dearborn, along Michigan Avenue that was intended to revitalize the city's West Downtown area. The city solicited development proposals from several entities, including BKDC.[3] On April 25, 2002, the city and BKDC executed a

---

[1] *City of Dearborn v Burton-Katzman Development Company, Inc*, unpublished order of the Court of Appeals, entered May 17, 2012 (309758).

[2] *City of Dearborn v Burton-Katzman Development Company, Inc*, unpublished order of the Court of Appeals, entered November 28, 2012 (313213). In the same order, this Court consolidated docket numbers 309758 and 313213.

[3] Burton, Katzman, and Goss were either officers or shareholders of BKDC.

Preferred Developer Agreement ("PDA"). In relevant part, the purpose of the PDA was to provide a six-month period during which BKDC would work "exclusively" with the city to refine plans for development, to evaluate the feasibility of the development, and to arrange financing.[4] The PDA provided that, if it was successful, the Mayor would recommend to the City Council that the city enter into a development agreement with BKDC, or an affiliate BKDC could create (provided the affiliate included as principals Burton, Katzman, and Goss, and was managed by BKDC).

Before a development agreement for the project was executed, West Village[5] was created as a single-purpose entity ("SPE"). The record demonstrated that commercial real estate lenders typically require the creation of an SPE so a particular project can be secured with the specific property on which it is being built, and the lender is better able to take possession in the event of a default.

On July 31, 2003, the city and the "Developer" (West Village) executed a Development Agreement. Burton signed the agreement on behalf of the Developer. Burton was acting as President of BKDC. The signature line provided that BKDC was a "Member" of West Village. Attorney Daniel Share testified that B/K/G Investors, LLC was the sole member of West Village and it was a typographical error to list BKDC as a member. Share testified, instead, BKDC was the manager of West Village.

Section 1.03 of the Development Agreement indicated that the project was divided by areas: 1) Areas A-1 and A-2 (retail and commercial), 2) Area A-3 (residential), 3) Area B (parking decks), and 4) Area C (hotel and office or residential). According to the complaint, Westminster Homes, LLC f/k/a Abbey Homes, LLC (Abbey Homes) is an affiliate of BKDC, which was responsible for developing the residential areas. The city agreed to acquire the property, demolish structures on that property, and construct two parking decks on Area B. The Developer agreed to construct Areas A-1, A-2, A-3, and C. In the event of the Developer's default, Section 5.02 included the right "to seek and obtain an order of specific performance against Developer without the necessity of proving immediate irreparable harm or inadequate remedy at law."[6] Although the timeframe for performance of the contract could be extended for unavoidable delays, the parties agreed in Section 1.09 that the inability to obtain financing did not constitute such a delay.

---

[4] B/K/G Investors paid $1,000 per month during the course of the PDA exploration period to keep the PDA open.

[5] At that time, B/K/G Investors, LLC solely owned West Village. Burton, Katzman, and Goss were members of B/K/G Investors, LLC. In 2007, Westminster Properties acquired a membership interest in West Village. Burton, Katzman, and Goss were also members of Westminster Properties.

[6] At his deposition, Share testified that the city requested a personal guarantee, and after his clients rejected that request, his resolution was to offer specific performance without the burden of proving irreparable harm or other elements.

In May 2005, the city sold West Village the property for the individual portions of the project. Also in 2005, the city began constructing two parking decks, at a cost of over $12 million. The city raised money for the project by issuing bonds, which it intended to repay with tax revenue from the project, parking space leases, monthly parking permits, and daily parking revenues.

West Village constructed the retail buildings in Areas A-1 and A-2, which opened in June 2006, and 36 of the 48 condominiums in Area A-3. But West Village did not begin construction on the hotel and office or residential buildings in Area C. On March 7, 2007, the city sent a written notice of default.

In February 2008, Burton-Katzman Manager[7] replaced BKDC as the Manager for West Village. Burton and Katzman then dissolved BKDC, which, according to BKDC, had no assets except receivables that it had no expectation to collect. The city was not informed of the dissolution or replacement of BKDC and the record shows some correspondence from Charles DiMaggio[8] on behalf of BKDC to the city and at least one agreement signed by BKDC after its dissolution.

On January 16, 2009, the city filed a lawsuit against BKDC,[9] West Village Commons, LLC, Abbey Homes, Burton, Katzman, DiMaggio, and Share.[10] The first count asserted a claim for breach of contract against BKDC, West Village, and Abbey Homes, alleging that they breached the Development Agreement by failing to complete construction of Areas A-3 and C. Among other relief, the city sought specific performance for these defendant entities to finish the construction.

The second count asserted a claim for silent fraud against all defendants by failing to disclose the dissolution of BKDC. The city alleged disclosure was required by the Development Agreement. The city alleged that it had detrimentally relied on the silent fraud by continuing

---

[7] Share testified at his deposition that Burton-Katzman Manager was an LLC created to manage the Burton-Katzman organization's LLCs and avoid entangling the manager or its creditors in future litigation that "was not related to its management activities." Share testified that, at the time of its dissolution, he was not aware of any pending or threatened litigation against BKDC.

[8] DiMaggio testified that he works for Burton-Share Management Company (BSMC) and did not know that BKDC had dissolved.

[9] Even after dissolution, BKDC could still sue and be sued while winding up its affairs. MCL 450.1834. BKDC has not argued that it could not be sued under MCL 450.1834 because its affairs had been wound up.

[10] Share successfully moved for summary disposition, arguing he had no financial stake in the project as an attorney representing defendants and he owed no duty to the city.

negotiations, believing BKDC would fulfill its obligations, and delaying alternative remedies and litigation for breach of the Development Agreement.[11]

The defendants filed a partial motion for summary disposition, arguing that only West Village was a party to the Development Agreement. The city responded that whether BKDC was a party to the Development Agreement was a latent ambiguity, which could be resolved by reviewing the history of the negotiations. Former President of the Dearborn City Council and then Dearborn Mayor John B. O'Reilly averred that BKDC was the only company that had been subject to vetting during the PDA period and approved by the city to be a party to the Development Agreement. Even if West Village was the only Developer under the Development Agreement, the city urged the trial court to pierce the corporate veil over West Village to reach the other defendants.

At a June 12, 2009 hearing on defendants' motion, the trial court asked, "And is it not fair to say that [BKDC's] . . . fingerprints are over everything . . . from the beginning until . . . we stand here today?" On the record, the trial court ruled, "in fact the parties to this development agreement are [BKDC] and City of Dearborn . . . ." Then, the trial court entered an order denying defendants' motion on August 25, 2009.

The city filed a motion for summary disposition and specific performance, arguing that BKDC, West Village, and Abbey Homes were in default of the Development Agreement and the city was entitled to damages and specific performance. Defendants responded that there was at least a question of fact regarding the identity of the parties to the Development Agreement, whether veil-piercing was appropriate, and whether performance was impossible. Burton averred that West Village could not find a developer for Area C because of the recession, could not obtain financing to proceed, and even if the project could be financed, no tenants or buyers would utilize the buildings.

On September 3, 2009, the trial entered an order granting the motion with respect to Count I (breach of contract) and ruling: (1) BKDC was the "Developer" referenced in the Development Agreement, and (2) defendants BKDC, West Village and Abbey Homes breached the agreement. The trial court initially declined to rule whether specific performance was excused due to impossibility, including a lack of financing and demand for the project. After several more hearings, on December 8, 2009, the trial court rejected that defense and ordered BKDC, West Village, and Abbey Homes to complete construction no later than April 3, 2010. Regarding Count II (silent fraud), the trial court found questions of fact for a jury to decide and denied the city's motion for summary disposition.

The trial court subsequently allowed the city to file an amended complaint to add as defendants BSMC, B/K/G Investors, LLC, Burton-Katzman Manager, LLC, Bentley, Goss, and the trusts of Burton, Katzman, and Goss. In relevant part, the amended complaint requested veil-piercing to reach these new defendants because of their interrelationships and alleged failure to

---

[11] West Village Square Condominium Association intervened with what it described to be "almost identical" complaints.

-5-

regard corporate formalities. But the trial court denied the city's motion to amend the complaint to include a claim of fraud in the inducement as to all defendants. The city had alleged that it chose BKDC as the Developer based on its representations that it had the financial resources to complete the project and BKDC was a member (not just manager) of West Village. The city had further alleged that, as a result of the city's reliance on defendants' fraud, the city entered into the Development Agreement and built the parking decks. The trial court concluded that the fraud in the inducement claim was subject to a six-year statute of limitations and unenforceable as a matter of law.

On April 2, 2010, West Village, Abbey Homes, and BKDC moved for an extension to comply with the specific performance order, explaining their unsuccessful efforts to obtain financing, find local developers, and interest tenants for Area C. On May 14, 2010, the trial court ordered (1) BKDC, West Village, and Abbey Homes to commence construction by October 1, 2010, (2) if construction was not commenced, an evidentiary hearing would be held to determine whether BKDC, West Village, and Abbey Homes should be held in contempt of court, (3) BKDC, West Village, and Abbey Homes to pay the accumulated debt service ($3 million) on the city's bonds issued to pay for the parking deck construction. The trial court characterized the debt-service payment as "kind of a delayed finding of civil contempt."

BKDC, West Village, and Abbey Homes filed a claim of appeal from the May 14, 2010 order and, on August 26, 2010, this Court granted the city's motion to dismiss for lack of jurisdiction, because the May 14, 2010, order was not a final order under MCR 7.202(6).

On the same day as the dismissal of the claim of appeal, BKDC, West Village, and Abbey Homes filed Chapter 7 petitions in the federal bankruptcy court. On June 30, 2011, the bankruptcy court dismissed BKDC because it filed in bad faith and lifted the automatic stay. The bankruptcy court found that there was no legitimate purpose for the bankruptcy since BKDC had been dissolved two years before the filing of the bankruptcy petition, BKDC had no assets or liabilities except the city's lawsuit, and it appeared the filing was purely a litigation tactic.

After the automatic stay was lifted in the bankruptcy court as to BKDC, the city filed a motion to reinstate the order of specific performance and enforce contempt sanctions against BKDC. BKDC responded that it had no assets to pay the sanctions or complete construction. The city replied that BKDC only lacked assets because it dissolved to avoid liabilities. On August 24, 2011, the trial court ordered: (1) the specific performance order be reinstated as to BKDC only, (2) BKDC to commence construction by August 25, 2011, and (3) BKDC to pay the city's accumulated debt service.

The parties subsequently filed cross-motions for summary disposition of the veil piercing, breach of contract, and silent fraud claims. On February 7, 2012, the trial court granted summary disposition to the city against BSMC on the breach of contract claim by piercing the corporate veil:

> The court agrees with Defendants that the City has failed to meet the elements necessary to pierce the corporate veil, with respect to all entity and individual defendants, except with respect to [BSMC]. Plaintiff has presented evidence to pierce the corporate veil to reach [BSMC]. [BSMC] did supply employees to

[BKDC] and these employees did make decisions with respect to the project. Deposition evidence indicates that there was no written lease agreement between [BSMC] and [BKDC] prior to 2003 and the 2004 agreement did not specify which employees were being leased. Moreover, Plaintiff has pointed out that according to Mr. Bentley, Mr. DiMaggio continued to work with the City to try to develop Parcel C as an employee of [BSMC] as [BSMC] was not receiving reimbursement from any other entity for his work. Finally, there is evidence that [BSMC] controlled the "F660" account[12] and that funds from the various entities were com[m]ingled with this account. [Footnote added.]

The trial court refused to pierce the corporate veil to reach the other defendants added in the amended complaint (B/K/G Investors, LLC, Burton-Katzman Manager, LLC, Bentley, Goss, and the trusts of Burton, Katzman, and Goss) and dismissed the breach of contract and silent fraud claims against them. The only remaining claims were for silent fraud against BSMC, West Village, BKDC, and Abbey Homes.

The city filed a motion for BKDC, Burton, and Katzman to be held in civil contempt pursuant to MCR 3.606(a), requesting Burton and Katzman be fined $7,500, imprisoned until BKDC specifically performed, and ordered to pay at least the accumulated debt service. BKDC argued it could not be held in contempt for failing to comply with the order where it lacked the ability to comply. The trial court ruled on the record, "I am not finding anybody in contempt today." On March 30, 2012, the trial court ordered Burton and Katzman to commence construction by May 18, 2012. The trial court explained the basis for ruling that Burton and Katzman should comply with the specific performance order:

Because there is nobody else around who potentially can do this other than those 2. And the entity can't do it, because the entity has been dissolved by the 2 of them. That's why.

In Docket No. 309758, this Court subsequently granted leave to Burton and Katzman following their emergency application seeking leave to appeal the August 24, 2011 and March 30, 2012 orders. A stay was granted regarding those specific orders, but not the entire lower court proceedings. After leave to appeal was granted, BKDC, BSMC, and the city each filed claims of cross-appeal.

Meanwhile, on October 19, 2012, the trial court granted the city's motion for an order of specific performance against BSMC. Then, the trial court entered an order staying the proceedings pending appeal. In Docket No. 313213, this Court granted BSMC's application for leave to appeal the October 19, 2012 order. In the same order, this Court consolidated the appeals in Docket Nos. 309758 and 313213.

---

[12] Bentley, Chief Financial Officer of BSMC, explained that BSMC, as manager of the Burton-Katzman entities, dispersed money on behalf of West Village and BKDC from its F660 account. Sometimes, the account balances for each entity would be in surplus or "run at a deficit."

II

A

BKDC first argues on appeal that the trial court erred when it denied BKDC's motion for summary disposition of the breach of contract claim on August 25, 2009, granted the city's motion for summary disposition of that claim on September 3, 2009, and ruled that BKDC was the Developer under the Development Agreement. We agree.

"We review de novo a trial court's decision on a motion for summary disposition[.]" *Bronson Methodist Hosp v Auto-Owners Ins Co,* 295 Mich App 431, 440; 814 NW2d 670 (2012). A motion for summary disposition "tests the factual support for a claim and should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *MEEMIC Ins Co v DTE Energy Co,* 292 Mich App 278, 280; 807 NW2d 407 (2011). Evidence should be viewed in the light most favorable to the nonmoving party. *Greene v A P Prod, Ltd,* 475 Mich 502, 507; 717 NW2d 855 (2006).

"'A contract must be interpreted according to its plain and ordinary meaning.'" *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership* (*On Remand*), 300 Mich App 361, 386; 835 NW2d 593, 607 (2013), quoting *Holmes v Holmes*, 281 Mich App 575, 593; 760 NW2d 300 (2008).

> "Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning." [*Wells Fargo*, 300 Mich App at 386, quoting *Holmes*, 281 Mich App at 594.]

The first sentence of the Development Agreement provides:

> THIS DEVELOPMENT AGREEMENT (the "Agreement") is made as of the 23rd day of April, 2003, by and between THE CITY OF DEARBORN, a municipal corporation, organized and existing under the laws of the State of Michigan (the "City"), and WEST VILLAGE COMMONS, LLC, a Michigan limited liability company (the "Developer").

This language is plain—the parties to the contract are the city and West Village. BKDC is not a listed party to the contract. As BKDC argues on appeal, BKDC was an agent of West Village. The signature page evidences this relationship. Burton signed on behalf of BKDC, which was acting on behalf of West Village. Where an agent signs in a representative capacity on behalf of the principal, the agent is not a party. *Riddle v Lacey & Jones*, 135 Mich App 241, 246-247; 351 NW2d 916 (1984). Moreover, "an agent for a disclosed principal . . . cannot be held liable for his principal's failure to perform." *Id*. at 247.

Contrary to the city's claim, no latent ambiguity existed regarding the term "Developer."

> To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010) (footnotes omitted).]

The city cited the fact that the BKDC, not West Village, performed actions in the recitals and throughout the Development Agreement, which were required to be performed by the Developer (i.e., entering the PDA, providing a site plan, and receiving communications). But West Village was an SPE created for the purpose of financing the project, and BKDC was acting as an agent of West Village. That BKDC performed certain actions on behalf of the SPE is not inconsistent with this agency relationship.

The city argues that West Village, which was newly created at the time the Development Agreement was executed, could not be the "experienced and capable developer" referenced by the parties in Section 3.01. But as BKDC argues, a corporate entity acts through its employees and the combined knowledge of employees or agents may be imputed to the entity. *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 213-214; 476 NW2d 392 (1991). Here, West Village was represented by BKDC, which was led by Burton, Katzman, and Goss who undisputedly have a wealth of experience in building development projects. Therefore, the reference to the Developer's experience created no ambiguity.

Section 6.01 also created no ambiguity that the Developer was distinct from BKDC. That section provides:

> Notwithstanding anything in this Agreement to the contrary, Developer may, without the City's consent, assign all or any of its rights and obligations under this Agreement to any other entity that is wholly-owned by Developer for purposes of acquiring and constructing the Project; or *to an entity affiliated with Developer that is managed by Burton-Katzman Development Company, Inc.* and in which Peter K. Burton, Robert M. Katzman and Laurence R. Goss are principals . . . . [Emphasis added.]

If BKDC was the Developer, the parties would have required an assignee to be both affiliated and managed by BKDC, and the parties would not have distinguished the Developer (affiliate) and BKDC (manager).

Last, the publication offered as evidence by the city creates no ambiguity. Although the publication provides the city chose "Burton-Katzman" for the project, it also clearly identifies, in bold, that the "Owner" is West Village. Share testified that "Burton-Katzman" refers to Burton, Katzman, or their organization, not BKDC specifically. It was not inconsistent to advertise that the organization had obtained a new project by using the Burton-Katzman name, which was more familiar than the SPE created solely for the project.

In sum, BKDC was not the Developer under the Development Agreement.

B

BKDC next argues that the trial court erred by piercing West Village's corporate veil to impose the requirement on BKDC that it specifically perform the duties of the Developer under the Development Agreement. We agree.

"'[A]bsent some abuse of corporate form, . . . corporations are separate and distinct entities.'" *Dutton Partners, LLC v CMS Energy Corp*, 290 Mich App 635, 643; 802 NW2d 717 (2010), quoting *Seasword v Hilti, Inc (*After Remand*)*, 449 Mich 542, 547; 537 NW2d 221 (1995). "For the corporate veil to be pierced, the plaintiff must aver facts that show (1) that the corporate entity is a mere instrumentality of another entity or individual, (2) that the corporate entity was used to commit fraud or a wrong, and (3) that, as a result, the plaintiff suffered an unjust injury or loss." *Id*.; see also *Florence Cement Co v Vettraino*, 292 Mich App 461, 469; 807 NW2d 917 (2011) and *Rymal v Baergen,* 262 Mich App 274, 293-294; 686 NW2d 241 (2004).

In *Dutton*, this Court noted, "We were unable to locate any binding Michigan case that has held that the corporate veil may be disregarded absent a showing of fraud, wrongdoing, or some misuse of the corporate form." *Id*. at 645 n 5. This Court concluded it was not sufficient grounds to pierce the corporate veil when the parent and subsidiary are merely alter egos. *Id.* at 644-645.[13] Summary disposition was appropriate where, even though questions of fact existed regarding whether a subsidiary was a mere instrumentality of the parent company, the plaintiff failed to demonstrate any evidence of fraud, wrongdoing, or misuse of the corporate form. Cf *Bash v Textron Financial Corp*, 483 BR 630 (ND OH, 2012) (appropriate to disregard the corporate form of an SPE where it was a mere instrumentality and it could be fairly inferred that the debtor set up the SPE to further its fraudulent scheme).

The city argues on appeal that West Village was under BKDC's complete control and staffed by employees leased by BKDC; they shared an officer (Burton), owners, office space, letterhead, email, and insurance. The city also claims that West Village and BKDC commingled assets and paid bills from BSMC's F660 account. Just as in *Dutton* and viewing the facts in a light most favorable to the city, *Greene*, 475 Mich 507, we conclude that even if a question of fact existed regarding an alter-ego relationship between West Village and BKDC, the city has failed to demonstrate any evidence of fraud, wrongdoing, or misuse of the corporate form that caused the city unjust injury or loss. On appeal, the city merely states in passing that "West Village's corporate form was abused to injure the City."

"It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the

---

[13] The city cites *Herman v Mobile Homes Corp*, 317 Mich 233, 244; 26 NW2d 757 (1947) for the proposition that only an alter-ego relationship is necessary, but *Herman* is distinguishable from this case and other cases requiring actual fraud because the parent company in *Herman* repeatedly recognized and acknowledged its responsibility to the plaintiffs (who had contracted with a subsidiary, not the parent company).

basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." [*People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001), quoting *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).]

Therefore, the city has waived any claim that West Village's corporate veil should be pierced to reach BKDC. We note that, in the trial court, the city made silent fraud and fraud in the inducement claims involving the project. But even if the city had not waived its veil-piercing claim to reach BKDC, we conclude later in this opinion that those claims could not survive summary disposition. Absent any fraud or wrong by BKDC that caused the city unjust injury or loss with respect to the Development Agreement, West Village's corporate veil cannot be pierced to impose liability on BKDC.

Because we conclude that BKDC was not the Developer and could not be reached to impose liability for breach of contract by piercing West Village's corporate veil, the trial court erred by denying BKDC's motion for summary disposition of the breach of contract claim, and instead granting summary disposition to the city and ordering BKDC to specifically perform the duties of the Developer under the Development Agreement.[14]

C

BKDC also argues that the trial court abused its discretion by finding it in contempt for failing to specifically perform the obligations of the Developer under the Development Agreement. We agree. Even though the order for specific performance against BKDC was erroneous, we must nevertheless consider the propriety of the trial court's May 14, 2010 and August 24, 2011 orders of contempt for the failure to specifically perform because, generally, a party must comply with a court's order, even if it is clearly incorrect. *Johnson v White*, 261 Mich App 332, 346; 682 NW2d 505 (2004). But an inability to comply with a trial court's order is a defense to a civil contempt proceeding. *United States v Rylander*, 460 US 752, 757; 103 S Ct 1548; 75 L Ed 2d 531 (1983); *City of Detroit v Dep't of Social Servs*, 197 Mich App 146; 494 NW2d 805 (1992).

Again, the December 8, 2009 order required BKDC, West Village, and Abbey Homes to specifically perform the duties imposed on the Developer in the Development Agreement. The record demonstrates that when the trial court found BKDC, West Village and Abbey Homes in contempt for failing to specifically perform and ordered them to pay the city's accumulated debt service, each of the entities was unable to comply with the trial court's order. *Id.* Bentley explained that these entities did not have the financial resources to pay for the project independently, and according to expert opinions, financing for the Project was impossible. Burton, DiMaggio, and Bentley submitted affidavits about the entities' unsuccessful requests for

---

[14] In light of this conclusion, we decline to address BKDC's argument that it could not be liable for the acts or obligations of West Village under MCL 450.4501(4), that a question of fact existed regarding whether it breached the Development Agreement or PDA, and that the defense of impossibility should have defeated the city's claim for specific performance.

financing from five banks and for development of the Project to 10 developers. The trial court abused its discretion by finding BKDC, West Village, and Abbey Homes in contempt on May 14, 2010.

Moreover, when trial court proceedings resumed following the temporary stay occasioned by the bankruptcy proceeding, the trial court reinstated its order against BKDC for specific performance and to pay the accumulated debt service despite having made a specific finding that BKDC was unable to "pay anything." In light of the trial court's factual conclusion that BKDC had no resources, it was outside the range of principled outcomes for the trial court to use an order of contempt to attempt to coerce BKDC to perform the duties of the Developer. Thus, in reinstating the order of contempt against BKDC, the trial court abused its discretion.

III

BKDC next argues that the trial court erred by denying BKDC's motion for summary disposition of the silent fraud claim on August 25, 2009. We agree.

The elements of silent fraud are: (1) the defendant failed to disclose a material fact about the subject matter at issue; (2) the defendant had actual knowledge of the fact; (3) the failure to disclose the fact gave the plaintiff a false impression; (4) when the defendant failed to disclose the fact, he or she knew that the failure to disclose would create a false impression; (5) when the defendant failed to disclose the fact, he or she intended that the plaintiff rely on the resulting false impression; (6) the plaintiff indeed relied on the false impression; and (7) the plaintiff suffered damages resulting from his or her reliance. See *Hord v Environmental Research Institute of Michigan*, 228 Mich App 638, 645; 579 NW2d 133 (1998).

Section 2.05 of the Development Agreement provided, in relevant part:

City and Developer shall periodically keep one another informed of their respective efforts to satisfy the conditions precedent to Closing. In the event City or Developer become aware that any of the representations and warranties they have made in this Agreement have *become untrue*, they shall promptly notify the other, and the party making such representation or warranty shall take reasonable steps to cause the representation and warranty to become true. [Emphasis added.]

The thrust of the city's silent fraud claim was that when it contracted for the project, it relied on the representations and warranties that BKDC (with its good reputation and knowhow) would be involved (at least as a manager). Therefore, when BKDC dissolved, the city should have been informed that this representation had "become untrue" pursuant to Section 2.05.

As BKDC argues, misrepresentations relating to the performance of a contract do not give rise to an independent cause of action in tort. See *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 373; 532 NW2d 541 (1995). Fraud must be extraneous to the contract in order to cause harm distinct from that caused by the breach of contract. *Id*. A plaintiff must establish a "violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 84; 559 NW2d 647 (1997). No cause of action in tort exists when the plaintiff fails to "allege violation of an

-12-

independent legal duty distinct from the duties arising out of the contractual relationship." *Id*. at 85.

The city maintained that it entered the agreement believing that BKDC was involved and continued to attempt to obtain performance of the agreement after the dissolution based on the belief that BKDC was still involved. Thus, any duties to disclose that BKDC dissolved would have arisen from the Development Agreement (see Section 2.05) or the performance of the Development Agreement (including meetings and communications with officers and employees of the Burton-Katzman organization regarding performance where information about the dissolution was withheld). Because any duty to disclose cannot be extracted from the Development Agreement, the trial court erred when it denied BKDC's motion for summary disposition of the silent fraud claim. *Rinaldo's*, 454 Mich at 84-85; *Huron*, 209 Mich App at 373.[15]

IV

Next, Burton and Katzman argue the trial court erred by directing them to specifically perform the duties of the Developer, either under the Development Agreement or by virtue of piercing the corporate veil of BKDC. We agree.

Again, the language of the Development Agreement is plain—the parties to the contract are the city and West Village. Burton and Katzman are not parties to the contract. Burton signed the contract in his representative capacity as a President of BKDC and is therefore not a party under *Riddle*. 135 Mich App 246-247. The city did not bargain for a personal guarantee from individual representatives or other entities. Therefore, the Development Agreement did not provide a basis for the trial court's order requiring specific performance by Burton and Katzman. As discussed further below, and as the trial court correctly found, corporate veil-piercing could not provide a basis for the order requiring Burton and Katzman to specifically perform. There is no evidence Burton and Katzman dissolved BKDC for their own purposes, *Dutton*, 290 Mich App at 643-644, and the dissolution did not cause the city unjust injury or loss because BKDC was only the manager of the Project and it was replaced by a new manager with the same experienced representatives and principals.[16]

---

[15] Even if this silent fraud claim were not defeated by its relationship to the contract, the city could not establish that it actually relied on the failure to disclose to its detriment. The city claims that, if it had known BKDC dissolved, it would have filed suit earlier because it lost BKDC's good reputation on the project. But the interrelationship of the entities in the Burton-Katzman organization, as argued strenuously by the city, works against the city here. Even though the entity managing the project changed, the leaders with the good reputation—Burton, Katzman, and Goss—behind the new entity were the same.

[16] In light of this conclusion, we decline to address Burton and Katzman's argument that the specific performance order violated ex post facto principles.

BSMC argues that the trial court erred by piercing BKDC's corporate veil and thereafter ordering BSMC to specifically perform the Developer's duties under the Development Agreement. Consistent with our conclusion in Section II that BKDC was not liable for the duties of the Developer under the Development Agreement or through corporate veil-piercing, we conclude that the city cannot pierce BKDC's corporate veil to hold BSMC liable for those duties.

Although not specifically raised by BSMC, we note that the trial court's orders actually pierced the corporate veils of West Village and Abbey Homes, not just BKDC. This Court does not generally address issues not raised by the parties on appeal, *Clohset v No Name Corp* (*On Remand*), 302 Mich App 550, 560; 890 NW2d 375 (2013), citing *Mayberry v Gen Orthopedics, PC*, 474 Mich 1, 4 n 3; 704 NW2d 69 (2005), but this Court may properly review "an unpreserved question of law where the facts necessary for its resolution have been presented," *People v Houston*, 237 Mich App 707, 712; 604 NW2d 706 (1999).

BSMC maintains that it was merely the centralized manager or paymaster that leased employees for the Burton-Katzman organization, which it claims is legal, a common practice in business, and does not make it a mere instrumentality of the entities in the organization. See *Judson Atkinson Candies, Inc, v Latini-Hohberger Dhimantec*, 529 F3d 371, 380 (CA 7, 2008), *Lowell Staats Mining Co v Pioneer Uravan*, Inc, 878 F2d 1259, 1264 (CA 10, 1989), and Michigan Administrative Code 421.190 (regarding employee leasing). Moreover, BSMC explains that the F660 account was merely used as a pooled entity checking account, and as an agent of the Burton-Katzman organization entities, BSMC used the F660 account to pay invoices and manage the entities' accounts.

The city cites to facts that suggest there exists at least a question of fact regarding whether BSMC was a mere instrumentality: 1) West Village had no employees, 2) West Village was managed by BKDC, but BKDC's employees were leased from BSMC, 3) Burton supervised BKDC and BSMC, and employees would not be able to distinguish whether Burton was directing them as the head of BKDC or the head of BSMC, 3) DiMaggio, who was paid by BSMC, continued to pursue development of the Project after BKDC was dissolved, and 4) BSMC accepted more money into the F660 account from West Village than BSMC was owed so West Village could avoid setoff from Bank of America.

Regardless whether a question of fact exists regarding whether BSMC was a mere instrumentality, however, the city has yet again failed to establish fraud, wrongdoing, or misuse of the corporate form that caused the city unjust injury or loss. The city claims that the breach of the Development Agreement, alone, amounts to wrongdoing that harmed the city. The city relies on *United States Fire Insurance Co v Polestar Constr of Florida*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued May 27, 2010 (Docket No. 09-12362) to argue that the mere breach of the Development Agreement warrants piercing

the corporate veil here.[17]  In *Polestar*, the interrelationship between a Florida business and a Michigan business involved loosely transferred money between the businesses to maintain the "heartbeat" of the Michigan business.  As a result of the transfer of money to the Michigan business, the Florida business could not pay its insurance premiums to the plaintiff insurer.  *Id.* at 35-36.  The *Polestar* court concluded that, when the plaintiff insurer contracted with the Florida business, it was entitled to assume that it would be operated for the Florida business's benefit and not that of the Michigan business.  *Id.* at 37.

Unlike the breach in *Polestar*, however, the breach of the Development Agreement here was not caused by the any interrelationship of BSMC to entities in the Burton-Katzman organization.  There is no evidence that, but for the leasing of employees, Burton's concurrent leadership, or the use of the F660 account, the city would not have suffered the $19,841,771.67 in damages it claims.  The evidence in the record demonstrates that the development of Area C was hampered by the economic downturn.  Accord *Nogueras v Maisel & Assocs of Michigan*, 142 Mich App 71, 86; 369 NW2d 492 (1985) (nothing in the record to support a finding of fraud or wrongdoing, or that the alleged interrelationship caused the alleged loss or injury).  Therefore, the trial court erred when it granted the city's motion for summary disposition of the breach of contract claim against BSMC by piercing the corporate veil, and ordered it to specifically perform the duties of the Developer under the Development Agreement.[18]

VI

The city argues on cross-appeal that the trial court erred by denying an October 2009 motion to amend the city's complaint to include a fraud in the inducement claim.  The trial court found that the six-year period of limitations had expired because the claim accrued when the city entered the Development Agreement in July 2003.  The city maintains the claim accrued later, at the time of the breach of the Development Agreement in 2006, and that therefore, the statute of limitations had not expired.  The city also argues that, even if the period of limitations had expired, the claim should relate back to the date of the filing of the complaint.

The denial of leave to amend is reviewed for abuse of discretion. *Franchino v Franchino*, 263 Mich App 172, 189; 687 NW2d 620 (2004), but the application of a statute of limitations is a question of law reviewed de novo.  *Attorney Gen v Harkins*, 257 Mich App 564, 569; 669 NW2d 296 (2003).  Even if a trial court abuses its discretion by denying the amendment, this Court will only reverse if the amendment would have averted summary disposition.  *PT Today, Inc v Comm of the Office of Fin & Ins Servs,* 270 Mich App 110, 144-145; 715 NW2d 398 (2006).

To establish a claim of fraud in the inducement, a plaintiff must establish that:

---

[17] Decisions of lower federal court decisions are not binding on this Court.  *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[18] Because any order requiring BSMC to specifically perform the duties of the Developer under the Development Agreement should be reversed, we decline to address BSMC's argument that specific performance was impossible.

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that is was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 161; 742 NW2d 409 (2007) (citation and quotation marks omitted).]

The first basis of the city's fraud in the inducement claim was that Share made representations that BKDC had the "financial resources" to complete the Project and the Development Agreement provided that the Developer had the "financial resources" to complete the Project.[19] The city claims it entered the Development Agreement, based on these representations, believing the Project would be completed with the entities' cash reserve, as opposed to financing. But any representation about "financial resources" was not limited to the Developer's cash reserve. "[R]esources" is defined as "a source of supply or support," *Merriam-Webster's Collegiate Dictionary* (2012), and therefore "financial resources" could include financing as a source of money to complete the Project. Moreover, the city cannot prove that any representation about West Village's "financial resources" was false at the time it was made. Rather, the Development Agreement provides West Village had arranged for financing for Areas A-1, A-2, and A-3, and the city's mayor had approved evidence of West Village's capacity to arrange for financing for Area C. Any change in West Village's financial resources following the execution of the Development Agreement due to the economic downturn did not amount to fraud.

The second basis of the fraud in the inducement claim was that BKDC signed the Development Agreement as a member, not the manager, of West Village. But as BKDC argues, whether it was a member or a manager of Development Agreement was not material and should not have affected the city's decision-making, because either way, Burton and Katzman (whose reputations the city valued) were involved in the Project. In addition, even assuming that BKDC was a member of West Village, it could not be held personally liable for the acts, debts, or obligations of West Village. MCL 450.4501(4).

Because the city's fraud in the inducement claim could not survive summary disposition, any error in the failure to allow the city to amend the complaint to include the fraud in the inducement claim was harmless. *PT Today*, 270 Mich App 144-145.[20]

---

[19] Any references to BKDC were not "material representations" because it was not the Developer.

[20] The trial court granted defendants' motion to strike certain allegations in the complaint related to the fraud in the inducement claim. The city complains that those allegations were also relevant to its silent fraud claim, but we concluded earlier in this opinion that that claim could not survive summary disposition either. The city therefore cannot demonstrate an abuse of

Next, the city argues on cross-appeal that irregularities in the case evaluation process required that the case be referred back for a new case evaluation.  We disagree.

First, the city claims that a panelist was potentially biased because he had previously served as opposing counsel in a case against the city and the city won a large award.  Pursuant to MCR 2.403(E), MCR 2.003 governs the determination whether a case evaluator should be disqualified.  Because "[a] trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption," *Mitchell v Mitchell,* 296 Mich App 513, 523; 823 NW2d 153 (2012), we apply the same test with regard to the city's claim that the case evaluator was biased.  MCR 2.003(C)(1)(d) provides that a judge should be disqualified if "[t]he judge has been consulted or employed as an attorney in the matter in controversy."  Here, the case evaluator was not employed as an attorney in the matter, but in a past matter involving only one party.  "Merely proving that a judge was involved in a prior trial or other proceeding against the same defendant does not amount to proof of bias for purposes of disqualification." *People v Upshaw,* 172 Mich App 386, 388; 431 NW2d 520 (1988); see also *People v Rich*, 172 Mich App 494, 495-496; 432 NW2d 352 (1988).  The city does not allege or establish that any of the case evaluator's conduct or awards displayed deep-seated favoritism or antagonism that would have made a fair case evaluation impossible.  See *Cain v Dep't of Corrections,* 451 Mich 470, 496; 548 NW2d 210 (1996).  Therefore, the trial court did not abuse its discretion by denying the motion to refer the case back to case evaluation based on the alleged bias of a case evaluator.

Second, the city claims the award was tainted because it was amended after ex parte communications with defendants and it is unclear if the amendment was unanimous.  As BKDC argues, the city apparently agreed that defendants should attempt to seek clarification regarding the award.  Therefore, any objection to that communication is waived. *Acorn Inv Co v Mich Basic Prop Ins Ass'n*, 495 Mich 338, 357; 852 NW2d 22 (2014), quoting *People v Vaughn*, 491 Mich 642, 663; 821 NW2d 288 (2012) ("A 'waiver is the intentional relinquishment or abandonment of a known right.' ").  Moreover, there is no dispute that, while the amendments to the award were not initialed by each case evaluator, the provision in the award that it was unanimous was not amended.  For these reasons, the trial court did not abuse its discretion by denying the motion to refer the case back to case evaluation based on alleged irregularities regarding the amendment.

Last, although MCR 2.403(K)(2) requires a separate award as to each claim against each defendant, the case evaluators here made seven separate awards, but each award involved several defendants.  On appeal, the city claims that, as a result of the combined awards, it could not determine whether liability was joint and several as to the defendants in each individual award or as to all the defendants in the case.  At the hearing on the motion to refer the case back to case evaluation, defendants conceded that liability was joint and several as to the defendants in each individual award.  This concession was supported by the awards, which did not impose blanket

---

discretion regarding the motion to strike. *Belle Isle Grill Corp v City of Detroit*, 256 Mich App 463, 470; 666 NW2d 271 (2003).

joint and several liability to all defendants, but noted whether joint and several liability was applicable to the defendants in the box for each individual award. Following the hearing, the trial court provided the city extra time to make its decision whether to accept or reject the awards. Because the joint and several nature of the award was clear and any lack of clarity was resolved at the hearing, the city again fails to establish the trial court abused its discretion by denying the motion to refer the case back to case evaluation.

VIII

The city also argues on cross-appeal that the trial court abused its discretion by denying discovery requests for production of: 1) two papers Bentley brought to his deposition, 2) post-complaint attorney billing records for defendants, 3) further deposition of Bentley,[21] and 4) Burton and Katzman's personal financial information. We disagree.

"This Court reviews a trial court's decision to grant or deny discovery for an abuse of discretion." *King v Oakland County Prosecutor*, 303 Mich App 222, 236; 842 NW2d 403 (2013), quoting *Shinkle v Shinkle (On Rehearing)*, 255 Mich App 221, 224; 663 NW2d 481 (2003). "This Court reviews any factual findings underlying a trial court's decision for clear error." *Harrison v Munson Healthcare, Inc*, 304 Mich App 1, 17; 851 NW2d 549 (2014).

First, Bentley brought four documents to his deposition and only two were produced for discovery. The city moved for discovery of the other two documents pursuant to MRE 612(a), which provides, "If, while testifying, a witness uses a writing or object to refresh memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying." Bentley testified that the two documents produced were "the two that [he] specifically referred to in trying to answer one of your questions." Attorneys who were present at the deposition similarly noted their observations that he only relied on the two documents produced. At the motion hearing, the trial court found that Bentley did not rely on the other two documents and refused to order their production. On appeal, the city does not argue that this factual finding amounted to clear error. Because Bentley did not rely on the other documents, it was not an abuse of discretion to deny the motion for discovery of them under MRE 612(a). In light of this conclusion, we decline to address whether the attorney-client privilege would preclude production under MRE 612(a).

Second, the city claims the trial court abused its discretion by denying motions for production of information, including billing records and Burton and Katzman's personal financial information, which the city claims would have further demonstrated the interrelationship between West Village and the Burton-Katzman organization entities to pierce the corporate veil. But even if this information was admitted to demonstrate a question of fact regarding whether West Village was a mere instrumentality of any of the other entities, the city

---

[21] As BKDC argues, the city's claim regarding Bentley's deposition is not properly before this Court because it was not included in the Statement of Questions Presented. *Yono v Dep't of Transportation*, 299 Mich App 102, 114 n 4; 829 NW2d 249 (2012). We therefore decline to address it.

has not established that any evidence could have been admitted to satisfy the remaining elements of the veil-piercing test, i.e., that the entity was used to commit fraud or a wrong, and as a result, the city suffered an unjust injury or loss fraud/wrong and resulting injury. Thus, regardless of the outcome of the requests for production of discovery, the city could not prevail on its corporate veil-piercing claims. MRE 2.613(a); *Lewis v LeGrow*, 258 Mich App 175, 200; 670 NW2d 675 (2003).

IX

Last on cross-appeal, the city argues that the trial court erred when it refused to pierce the veils of BKDC, West Village, and Abbey Homes to reach Burton-Katzman Manager, B/K/G Investors, Burton, Katzman, and Goss (and their trusts), and Bentley. Again, because BKDC is not liable for duties of the Developer under the Development Agreement, its veil should not be pierced to hold other defendants liable for those duties. Moreover, even if the city could establish questions of fact regarding whether these defendants were mere instrumentalities of West Village or Abbey Homes, the city has failed to establish fraud, wrongdoing, or misuse of the corporate form that caused the city unjust injury or loss. The trial court properly denied the city's motion for summary disposition of the breach of contract claims against Burton-Katzman Manager, B/K/G Investors, Burton, Katzman, and Goss (and their trusts), and Bentley.

X

We reverse the trial court's orders granting summary disposition to the city on the breach of contract claim against BKDC and requiring BKDC to specifically perform the duties of the Developer under the Development Agreement, and we remand for entry of an order granting summary disposition of that claim to BKDC. We vacate the orders finding BKDC in contempt for failing to specifically perform.

We reverse the trial court's order denying BKDC's motion for summary disposition of the silent fraud claim, and remand for entry of an order granting summary disposition of that claim to BKDC.

We affirm the order denying the city's motion for summary disposition of the breach of contract claims against Burton-Katzman Manager, B/K/G Investors, Burton, Katzman, and Goss (and their trusts), and Bentley, and remand for entry of an order granting summary disposition of that claim to these parties. We reverse the trial court's order requiring Burton and Katzman to specifically perform the duties of the Developer under the Development Agreement.

We reverse the trial court's orders granting the city's motion for summary disposition of the breach of contract claim against BSMC and requiring BSMC to specifically perform the duties of the Developer under the Development Agreement. On remand, the trial court should enter an order granting summary disposition of the breach of contract claim to BSMC.

We affirm the trial court's orders regarding the motions to amend the complaint, to strike, to refer the case back to case evaluation, and for discovery.

As the prevailing parties on appeal, BKDC, BSMC, Burton, Katzman, Goss (and their trusts), Bentley, B/K/G Investors, and Burton-Katzman Manager, may tax costs against the city. MCR 7.219.

/s/ Jane E. Markey
/s/ David H. Sawyer
/s/ Kurtis T. Wilder